1  Mark A. Maasch (CSB#120637)
   TURNER & MAASCH, INC.
2  550 West C Street, Suite 1160
   San Diego, California 92101
3  Telephone (619) 237-1212
   Facsimile (619) 237-0325
4

FILED
'09 OCT -2 PH 3:04
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

ORIGINAL

BY: _____

5  Attorneys for Plaintiffs, Walter Witherspoon dba Racy Brothers Enterprizes and Lil' Walt Production

6  Ben Barnow
   **Barnow and Associates, P.C.**
7  One North LaSalle, Suite 4600
   Chicago, Illinois 60602
8  Phone: (312) 621-2000

9
   Michael Roberts
10 **Roberts Law Firm, P.A.**
   20 Rahling Circle
11 P.O. Box 241790
   Little Rock, AR 72223
12 Phone: (501) 821-5575

13
   Lance A. Harke, P.A.
14 **Harke & Clasby LLP**
   155 South Miami Avenue
15 Suite 600
   Miami, FL 33130
16 Phone: 305-536-8222

17
   Of Counsel
18

19

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

20 WALTER WITHERSPOON D/B/A RACY          )   Case No.:
   BROTHERS ENTERPRIZES and LIL WALT     )   '09 CV 2178 BTM          CAB
21 PRODUCTION, on behalf of themselves and all )
22 others similarly situated,               )
                                            )
23              Plaintiffs,                  )   **CLASS ACTION COMPLAINT**
                                            )
24        vs.                               )
                                            )
25 NATIONAL ASSOCIATION OF MUSIC          )
   MERCHANTS, INC; FENDER MUSICAL         )
26 INSTRUMENTS COMPANY; GIBSON           )
   MUSICAL INSTRUMENTS CORPORATION;       )
27 GUITAR CENTER, INC.; BAIN CAPITAL,      )
   LLC; C.F. MARTIN & CO., INC.; KORG, USA, )
28

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

INC.; PEAVEY ELECTRONICS; ROLAND )
CORPORATION U.S.; YAMAHA )
CORPORATION OF AMERICA; TASCAM, )
TEAC CORPORATION OF NORTH )
AMERICA, and TEAC, )
)
          Defendants )
                                     )

## CLASS ACTION COMPLAINT

    NOW COMES plaintiffs Walter Witherspoon d/b/a Racy Brothers Enterprizes and Lil Walt Production ("Plaintiffs"), on behalf of themselves and all others similarly situated, and for their Class Action Complaint, state as follows:

## I. INTRODUCTION

    1.    This lawsuit involves a nationwide class action seeking redress for businesses and consumers (collectively referred to as "consumers") who paid artificially inflated prices as the result of a concerted effort and conspiracy to coordinate retail pricing in the musical instrument and equipment industry. Defendants engaged in a conspiracy to inflate and fix the prices of musical products, including musical instruments and sound and audio recording equipment, to the detriment of consumers. As part of the illegal conspiracy, the defendants exchanged sensitive price information for musical products and agreed to adhere to minimum advertised pricing ("MAP") or minimum resale price maintenance ("RPM") agreements, which led to increased prices for consumers across the county. This coordinated and collusive effort between Defendant Guitar Center and the Defendant musical instrument and equipment manufacturers began in approximately 2001 and culminated in a United States Federal Trade Commission ("FTC") investigation of illegal behavior in a time period from 2005 through 2007 during winter and summer trade shows held by Defendant National Association of Music Merchants ("NAMM"). The FTC issued a cease and desist order against NAMM. This lawsuit is brought pursuant to federal antitrust law, various state antitrust and consumer protection statutes, and for common law restitution and unjust enrichment.

## II. JURISDICTION AND VENUE

    2.    This action arises under federal law and statutory and common laws of various states.

Law Offices
TURNER & MASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

2012.01\b\01

2

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332 and 1337.  Defendants have transacted business and their affairs in California and have committed the acts complained of in the Southern District of California. The amount in controversy exceeds $5,000,000.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district. Defendants have transacted business and their affairs in this district and have committed the acts complained of in this district.

### III. PARTIES

5.     Plaintiffs Walter Witherspoon d/b/a Racy Brothers Enterprizes and Lil Walt Production are domiciled in the State of Arkansas.  Plaintiffs are involved in the music industry and have purchased musical instruments, including guitars, amplifiers, drum sets and audio recording equipment for use in creating music, setting up sound systems and for installation in churches and other organizations, during the relevant period.    Plaintiffs purchased said instruments and equipment from Defendant Guitar Center, Inc. and from other distributors.

6.     Defendant National Association of Music Merchants ("NAMM").  NAMM is a New York corporation organized in 1901 with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008.   NAMM is a trade association composed of more than 9,000 members that include manufacturers, distributors, and dealers of musical instruments and related products. Most U.S. manufacturers, distributors, and dealers of musical instruments are members of NAMM.  NAMM serves the economic interests of its members by, *inter alia*, promoting consumer demand for musical instruments, lobbying the government, offering seminars, and organizing trade shows.   It is one of the largest trade associations in the United States, and is the largest trade association in the music industry.

7.     Defendant Guitar Center, Inc. ("Guitar Center") has its principal place of business located at 5795 Lindero Cyn Road, Westlake Village, California 91362.   It is the world's largest retailer of musical products, including guitars, violins and other fretted instruments, drums and drum equipment, audio and video recording equipment and brass instruments.

Law Offices
TURNER & MARSCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

2012.01\b\01

3

8.    Defendant Fender Musical Instruments Company ("Fender") was incorporated in 1959, and is located at 7975 North Hayden Road, Scottsdale, Arizona. It controls approximately 50% of the United States market for solid-body electric guitars sold under various names, including Fender, Guild, Sunn, Floyd Rose, Rodriguez and Squier. It sells musical products with its primary product base being guitars and fretted instruments.

9.    Defendant Gibson Musical Instruments Corporation ("Gibson") is located in Nashville, Tennessee. Gibson is known for its "Les Paul" guitars and sells its guitars and musical products through Guitar Center.

10.    Defendant Peavey Electronics ("Peavey") is located in Meridian, Mississippi and is known for its guitars and amps. It sells its musical products through Guitar Center.

11.    Defendant Bain Capital, LLC ("Bain Capital') is an asset management company that, on information and belief, manages the assets of Guitar Center and has offices in North America.

12.    Defendant C.F. Martin & Co., Inc. ("C.F. Martin") is headquartered in Nazareth, Pennsylvania. It manufacturers guitars and sells its guitars through Guitar Center.

13.    Defendant Korg USA, Inc. ("Korg") is headquartered in Melville, New York. It manufacturers keyboards and other musical products and sells these musical products through Guitar Center.

14.    Defendant Roland Corporation U.S. ("Roland") is headquartered in Los Angeles, California. It manufacturers keyboards, drums and other musical products and sells these musical products through Guitar Center.

15.    Defendant Yamaha Corporation of America ("Yamaha") is located at 6600 Orange Thorpe Avenue, Buena Park, California, 90620. Yamaha sells its musical products, including instruments and audio and video recording equipment, through Guitar Center.

16.    Defendant TASCAM, a division of TEAC Corporation, is a company that engages in researching, designing, and manufacturing of professional audio and video recording equipment. It has a research center in Palo Alto, California. TASCAM sells its musical products, including mixing and audio and video recording equipment, through Guitar Center.

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212, FAX (619) 237-0325

17.    Defendant TEAC is a Japanese corporation with American affiliates, including TEAC Corporation of North America and TASCAM.[1]

### IV. CO-CONSPIRATORS AND AGENTS

18.    Other natural persons, corporations, and entities not specifically named as Defendants herein, upon information and belief, have participated in the unlawful conspiratorial activity as alleged further herein in violation of federal and various state laws.

19.    Whenever in this Complaint reference is made to a statement or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

### V. CLASS DEFINITION

20.    Plaintiffs bring this lawsuit on behalf of themselves and all other persons or entities similarly situated throughout the United States who purchased or leased for use and not resale, guitars, fretted instruments, keyboards, drums, audio equipment, and/or recording equipment that were manufactured by the Defendant Manufacturers during the period beginning January 1, 2002 through the trial of this matter.

21.    The proposed class is defined objectively, in terms of ascertainable criteria, independent of the merits of this lawsuit, such that the Court may determine the constituency of the class for the purposes of the conclusiveness of any judgment that may be rendered in this case.

### VI. FACTUAL ALLEGATIONS

22.    Guitar Center, founded around 1959 in California, started as a retailer of organs, guitars and amplifiers. Its focus as a retailer was on musical instruments. Guitar Center has become the world's largest retailer of musical instruments and equipment and has carried on the business of being a retail seller of musical instruments and equipment since its inception. While based in California, it has retail outlets all over the United States, an online store, and music

---

[1] Defendants Fender, Gibson, Peavey, Bain Capital, C.F. Martin, Korg, Roland, Yamaha, TASCAM, and TEAC are collectively referred to herein as "Defendant Manufacturers", and all references to "Defendants" refer to all Defendants.

Law Offices
TURNER & MASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Law Offices
TURNER & MASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1     catalogues where consumers can purchase music instruments and equipment over the phone or

2     through the mail.  In particular, Guitar Center sells guitars, fretted instruments, brass and other

3     musical instruments and sound, and audio and recording equipment, including electronic keyboards,

4     amplifiers, public address systems, mixing boards, multi-track recording equipment, professional

5     disk jockey equipment, and related accessories.  Guitar Center grew rapidly with an aggressive and

6     hard-line business plan in the 1990's by purchasing many retail stores.  It experienced phenomenal

7     growth in the 1990's and through the first decade of the 21st century.  Much of its expansion was

8     based upon purchasing actual physical retail establishments located throughout the United States.

9     However, as part of its attempt to monopolize and control the retail market, it expanded and

10    purchased an online and music catalogue company, "Musician's Friend", in 1999-2000, which

11    many consumers of musical instruments and equipment receive through the mail and can access for

12    online musical instrument and equipment purchases.  Thus, Guitar Center, by the year 2000, had

13    emerged as the dominant and most-well known supplier of musical instruments and equipment to

14    consumers in the United States.  Around this time period, Guitar Center then began utilizing MAP

15    pricing to maximize its profits and exercise dominance over the musical instrument and equipment

16    retail and manufacturing industry.

17        23.      From the period beginning 2000 to and through 2004, when MAP pricing became

18    the established retail pricing method for Defendants, Guitar Center experienced dramatic growth

19    and nearly doubled in the size of actual physical retail outlets, growing from 69 to 136 retail stores

20    nationwide.  Additionally, as part of its nationwide plan to monopolize the music retail industry,

21    during this time Guitar Center implemented an expansion plan to open up hundreds more retail

22    stores and to purchase online and music retail catalogue companies to control the retail market for

23    musical instruments and equipment.  By virtue of its unfair and unconscionable business tactics

24    with music manufacturers and competing retailers, Guitar Center ultimately acquired approximately

25    295 stores and has become the dominant retailer throughout the United States.  In many states, the

26    main retail establishment for musical instruments and equipment is Guitar Center.  Any consumer

27    that purchases musical instruments and equipment is affected by Guitar Center's predatory and

28    monopolistic behavior and its concerted effort to set, stabilize and maintain retail prices for musical

1  instruments and equipment. These prices for consumers are the "lowest" price at which a consumer

2  can purchase brand name musical instruments and equipment. Alternative sources of musical

3  instruments and products are difficult and burdensome for the consumer to find, and lower pricing

4  is rare and sporadic. Thus, the predatory and monopolistic behavior of Guitar Center has adversely

5  impacted consumers of musical instruments and equipment throughout the United States.

6      24.     Throughout its period of rapid growth into the world's largest retailer of musical

7  instruments and equipment, Guitar Center exhibited market power and control over the music

8  industry. Guitar Center frequently demanded and received preferential and discriminatory benefits,

9  promotional allowances, financial incentives, discounts, pricing and other favorable terms from the

10 Defendants Manufacturers with respect to musical instruments and equipment sold at its retail stores

11 or through its online companies and its catalogues. Because Guitar Center controlled the retail

12 market for such products, both in physical stores, through mail order catalogues, and online, and

13 was the direct link to consumers, Defendant Manufacturers worked in concerted effort with Guitar

14 Center's demands to establish and maintain fixed retail pricing to ensure profitability for Guitar

15 Center, or face losing the largest retailer for distribution of its product. As evidence of its incredible

16 market power and influence on supply, demand and pricing in the musical instrument market, in an

17 interview in Musical Merchandise Review (2007), Alan Levin of Chuck Levin's Washington Music

18 Center said:

19         The biggest concern is Guitar Center. They are many manufacturer's biggest
           customers and changes are being made ... to suit them alone.
20

21     25.     Guitar Center's biggest weapon for ensuring profitability to the detriment of

22 consumers was adopting MAP pricing policies in conjunction with Defendant Manufacturers and

23 strictly adhering to the policy through unfair and unconscionable business practices. At some point

24 in 1999, the idea to adopt MAP pricing policies was hatched and put into action. Several of the

25 Defendant Manufacturers in this lawsuit are major manufacturers of musical instruments and

26 equipment, including guitars and other fretted and stringed instruments, amplifiers, audio and video

27 accessories and equipment, and brass instruments. In coordination with retailers, Defendant

28 Manufacturers adopted MAP policies. Defendant Manufacturers who controlled the market for

Law Offices
TURNER & MANSCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1    their respective musical instruments and equipment entered into MAP or RPM exclusive dealer

2    agreements, where the retail price of musical instruments was fixed at a formulaic and artificially

3    high rate to maximize retailer profit, while at the same time ensuring a large consumer market for

4    the products manufactured by Defendant Manufacturers.    Defendant Manufacturers knew that

5    Guitar Center, as the dominant retailer, was their access to their primary customer base.  Thus, in

6    order to implement these pricing agreements, Defendant Manufacturers coordinated their pricing

7    with Guitar Center, and the main forum to facilitate this illegal fixed-pricing scheme was facilitated

8    through, and coordinated and encouraged by NAMM.

9        26.    NAMM, headquartered in New York, is principally located in California.  It is a

10    member based organization that hosts semi-annual trade shows for the music industry. NAMM

11    became the perfect conduit in which MAP pricing could be discussed, promoted and illegally

12    coordinated among the industry by the direct sharing of confidential and proprietary pricing

13    information between manufacturers of musical instruments and equipment with musical instrument

14    and equipment retailers (particularly Guitar Center), who were required to be members of NAMM

15    in order to attend NAMM trade shows and the more exclusive "break-out" sessions.  MAP policies

16    were orchestrated, coordinated and reinforced through trade shows and communication between

17    Defendants. NAMM, as an umbrella organization, facilitated the coordination of its member music

18    manufacturers' pricing, which was then effectuated through major distributors of musical

19    manufacturers, including Guitar Center, who were also members of NAMM, and who agreed to the

20    conspiracy and unlawful agreement to adhere to the MAP pricing for sales of musical instruments

21    and equipment to consumers.

22        27.    NAMM sponsors two major trade shows each year in the United States, where

23    manufacturers introduce new products and meet with dealers.  These trade shows are usually in the

24    winter and summer, and last for a series of consecutive days.  The trade shows, during the relevant

25    time periods alleged, Defendants were in Anaheim, California, or other states, including Indiana,

26    and provided Defendant Manufacturers an opportunity to meet and discuss issues of concern to the

27    industry, including NAMM and major music instrument retailers regarding forward retail pricing.

28    However, and importantly, NAMM is an exclusive trade show by nature and caters exclusively to

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1  its members.  Non-members, including retailers and consumers, typically cannot attend NAMM

2  unless by special invitation.  Thus, NAMM was an optimum forum for the price-fixing conspiracy

3  engaged in by Defendants.

4      28.    Defendants engaged in illegal behavior at NAMM and outside of the trade show,

5  excluding retailers and distributors who would not adhere to the illegal MAP pricing scheme

6  hatched and formulated at NAMM.  Smaller mom and pop retailers who did not adhere to MAP

7  pricing or the collusive MAP pricing scheme were excluded from the pricing meetings and had

8  difficulty obtaining musical instruments and equipment from Defendant Manufacturers or sale to

9  consumers.  MAP prices were enforced in the industry through exclusive distribution agreements

10  between Defendant Manufacturers and Guitar Center.  Other retailers that wished to sell musical

11  instruments and equipment manufactured by Defendant Manufacturers had to adhere to the fixed-

12  pricing agreements or they would lose authorization as a distributor.  Further, Guitar Center was the

13  primary retailer that coordinated the MAP pricing.  If a retailer was not on board with the MAP

14  program, it was retaliated against either by Defendant Manufacturers, Guitar Center, or both.

15      29.    As an example of Guitar Center's predatory and monopoly behavior pertaining to

16  MAP pricing and cutting away any competition from mom and pop competitors, is its successful

17  effort to interfere with an independent sound and recording studio in Florida in 2000, 2001, and

18  2002, which had a good working relationship with Defendant Yamaha and attempted to purchase

19  audio recording equipment from Defendants Yamaha and Tascam in 2001 and 2002 to sell these

20  products through its store.  However, as part of its massive nationwide expansion, Guitar Center

21  used its power as a national store and on-line retailer to directly and unfairly interfere with this

22  distributorship so that Yamaha and Tascam could sell exclusively through Guitar Center retail

23  stores at a collusive MAP price.  Martin Albertson, who was the Chief Operating Officer of Guitar

24  Center, actively implemented Guitar Center's nationwide predatory behavior in the musical

25  instrument and equipment industry by communicating directly with representatives of Yamaha and

26  Tascam, including Rick Young, the national sales manager for Yamaha, and Chuck Prada, the

27  Florida sales representative for TASCAM, and at NAMM trade shows.  Although Yamaha and

28  Tascam had approved distributorship agreements with the smaller retailer, because the retailer was

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1150
San Diego, California, 92101 - 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Class Action Complaint

competing with Guitar Center, as a result of Guitar Center's predatory and monopolistic behavior, Yamaha and Tascam, without explanation, dropped their distributorships so Guitar Center could continue purchasing retail outlets and dominate the music instrument market. Defendants Yamaha and Tascam dropped all business relationship with the independent retailer and stayed exclusively with Guitar Center who, as the world's largest retailer, controlled the market for musical instruments and equipment and was Yamaha and Tascam's largest retailer and direct supplier to consumers. Because there was no legitimate market alternative to sell Defendants' musical instruments and equipment to Guitar Center, which controlled the retail front, Defendant Manufacturers buckled under Guitar Center's predatory conduct and adhered to its supply and pricing requirements. Guitar Center and Defendant Manufacturers met with, exhorted, threatened, warned, cajoled, and/or negotiated with mom and pop and competing retailers under anti-competitive circumstances, whereby if Defendant Manufacturers would sell to the retailers, the retailers would have to acquiesce to and assure compliance with MAP pricing as determined by Defendants at NAMM trade shows or face termination and loss of a supply of musical instruments and equipment.

30.     From 2001 through 2007, Mr. Albertson, and other employees and agents of Guitar Center, actively engaged in an unfair, false, deceptive and unconscionable campaign with Defendant Manufacturers to prevent competition from other retailers. Guitar Center threatened retaliation if Defendant Manufacturers did not cooperate with Guitar Center, and coordinated this effort through NAMM, utilizing NAMM's exclusive membership policy, to exclude competing retailers. This coordinated and collusive effort between Guitar Center and Defendant Manufacturers began in approximately 2001 and culminated in an FTC investigation of illegal behavior for the time period from 2005 through 2007 during winter and summer trade shows held by NAMM.

31.     During the time periods that Guitar Center was engaging in predatory behavior against mom and pop retailers and enforcing MAP policies to ensure higher retailer profits, the FTC expressed concern over market dominance and the elimination of alternate channels of competition, particularly, through the Internet, where smaller retailers could sell music instruments and

Law Offices
TURNER & MANCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

2012.01\b\01

10

1   equipment directly to consumers and did not have to have a major physical presence or physical

2   retail outlets.  Knowing that the Internet provided an alternative market to its retail stores, online

3   store and catalogues, which were distributed through the mail, Guitar Center colluded with

4   Defendant Manufacturers, whereby Defendant Manufacturers agreed not do business with Internet

5   retailers who did not adhere strictly to MAP pricing, which was confidential and coordinated format

6   of pricing.   This type of predatory pricing placed the competing retailers at a competitive

7   disadvantage to Guitar Center who could strong-arm lower pricing, discounts, rebates, and

8   preferential pricing from Defendant Manufacturers and provide a discount to a consumer at its retail

9   stores, at its own discretion, because it effectively controlled the retail market.  Thus, Guitar Center,

10  through its market power and anti-competitive business power, in coordination with Defendant

11  Manufacturers, and facilitated by NAMM, eliminated any type of real competition.  Because of its

12  rapid growth and predatory behavior in acquiring retailers, Guitar Center's hardball behavior in

13  retaliating against other retailers and colluding with Defendants Manufacturers of musical

14  instruments and equipment, created a high barrier for new competitors, particularly those who tried

15  to compete using the Internet.  With the ability to impair entry into the musical instrument and

16  equipment retail business, the FTC was concerned about the predatory behavior exhibited by

17  traditional companies such as Guitar Center and its co-conspirator musical instrument and

18  equipment manufacturers, where its exclusionary and collusive market behavior was facilitated by

19  NAMM.  The FTC, in addressing traditional market barriers to new retailers who utilized the

20  Internet, were concerned about predatory and exclusionary behavior:

21  
22  
23  
> The promise of the world of electronic commerce is to create an environment
> where consumers can freely shop between various competitive alternatives.
> By reducing transaction costs and improving transparency, the Internet offers
> the potential of dramatically improving competition in various retail markets.

24  
> ***

25  
26  
27  
> [But] as new market forces arise, ... "traditional" competitors often respond to
> the threat by trying to create barriers to thwart those new entrants.  David A.
> Balto, Testimony Before the FTC, Office of Policy Planning, Public
> Workshop on E-Commerce, at 1-2 (October 10, 2002) (emphasis added).

28  
During that same workshop, FTC Commissioner Shiela Anthony stated:

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Class Action Complaint

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Competition among distributors for a given manufacturer's favor is almost certainly healthy. But problems may arise where distributors in one channel exercise their market power to disadvantage distributors in another channel. *** [C]an Internet distribution ever gain a strong foothold in some produce areas where the entrenched distribution channel, members who manufactures cannot do without, at least until e-commerce matures, use hardball tactics to make sure that the transition period never begins? See FTC Public Workshop: Possible Anticompetitive Efforts to Restrict Competition on the Internet, transcript of proceedings, at 797:12-16 (October 10, 2002) (remarks of Commissioner Shiela F. Anthony).

32.    The FTC investigation sought information beginning in 1999, and also focused on a time period beginning at a 2005 NAMM trade show in California. During the years 2005–07, NAMM organized various meetings and programs in Southern California (usually Anaheim), and other states (summer shows), involving manufacturers of musical instruments and equipment, including Defendant Manufacturers, where discussions related to strategies for restricting retail price competition and implementing non-competitive retail pricing policies across the United States were discussed, adopted, implemented and enforced by NAMM, between Defendant Manufacturers and through major retailers such as Guitar Center. The agreements between Defendants were related to pricing of musical instruments across the United States, including wholesale, retail, suggested and MAP prices for goods and services and components, or terms of pricing that Defendants used. Defendants, through their agents and employees, during the meetings at NAMM trade shows and in communications between themselves, exchanged competitively sensitive information, including price, output and cost data and information related to specific customers and future business plans. As a result of the pricing agreements reached by Defendants at NAMM trade shows, pricing decisions were not independent, but were instead based upon collusion in order to set higher consumer prices across the country.

33.    Further evidence of Defendant Manufacturers' collusive behavior toward pricing during this time period stems from an article commenting on discussions during FTC trade show sessions on MAP pricing:

Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for staring down an auditorium packed with independent retailers and stating that MAP should be scrapped. To audible boos, he declared, "Consumers like low prices, and we try to give them what they want. Why shouldn't we be able to grow our

1    business by offering the lowest possible prices without interference from the

2    manufactures?"

3        34.    This commentary from independent internet retailers attempting to compete with

4    Guitar Center and provide consumers of musical instruments and equipment with an alternative to

5    the MAP pricing system, which was strictly adhered to and provided no benefit to the consumer,

6    has been an ongoing concern for the FTC.  The FTC recognizes that some cooperative agreement

7    between manufacturers on pricing and service is okay, because the consumer will benefit.  These

8    type of cooperative industry efforts are known as "efficiencies."  However, as here with the musical

9    instrument and equipment industry, Defendant Manufacturers, in conjunction with Guitar Center,

10   utilized pricing restraints through advertisement and dealer agreements, all of which were

11   spearheaded by Guitar Center.  The substantial anticompetitive effects of these pricing agreements

12   override any plausible efficiency rationale because the MAP policies provided no benefit in price to

13   the consumer.  The contrary occurred:  consumers paid higher prices for musical instruments and

14   equipment.  No plausible business justification existed for the agreements between Defendant

15   Manufacturers and Guitar Center except to maximize corporate profits to the detriment of

16   consumers.  The MAP pricing provisions were implemented with the anticompetitive intent to limit

17   retail price competition and to stabilize retail prices in the musical instrument and equipment

18   industry.  Prior to the implementation of the MAP pricing provisions, new and competing retail

19   entrants had contributed to competitive pricing for consumers.  However, with the implementation

20   of MAP in conjunction with Guitar Center's remarkable domination of the physical retail stores in

21   the United States, catalogue sales through the mail, and Internet sales through the purchase of

22   Musician's Friend, the consuming public was at the mercy of predatory and monopolistic behavior.

23   Any smaller retailer had to adhere to Defendant Manufacturers' policies on advertised pricing or

24   risk being retaliated against and having the supply of musical instruments and equipment end and

25   lose their status as an authorized distributor.

26       35.    As a result of the coordinated efforts between Defendant Manufacturers and Guitar

27   Center, the FTC issued subpoenas and obtained information from several of the Defendants named

28   herein.  In March 2009, the FTC issued a cease and desist order to NAMM regarding NAMM's

Law Offices
TURNER & MANASH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

anti-competitive conduct, whereby it had "permitted and encouraged" activities at NAMM trade shows in Southern California, during the time periods 2005-2007, constituting "unfair methods of competition in or affecting commerce" in violation of federal law.

    36.    The FTC cease and desist order ordered NAMM to cease and desist from:

    (a)    Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

        (i)    The retail price of any Musical Product;

        (ii)    any term, condition, or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

        (iii)    the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

    (b)    urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

        (i)    the retail price of Musical Products; or

        (ii)    any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

    37.    As part of the FTC investigation and order, its Acting Director David P. Wales, stated: "Trade associations properly provide many services for their members, but enabling

Law Offices
TURNER & MANSCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

14

Class Action Complaint

competing sellers to work together to coordinate higher prices for their products is not a legitimate function." The FTC further stated the cease and desist order would "protect consumers from paying higher prices by ensuring that NAMM does not facilitate anticompetitive agreements or coordination." Plaintiffs herein seek restitution and to recover the higher prices consumers paid to Defendants as a result of the anticompetitive agreements or price coordination engaged in by Defendants and their co-conspirators.

## VII. RELEVANT MARKET

38.     The relevant market and geographic territory for the allegations contained herein concerns the entire United States musical instrument and equipment market, and specifically guitars, fretted instruments, keyboards, drums, audio equipment, and/or recording equipment. The collusion and conspiracy alleged herein arose and occurred in California and was adopted, implemented and enforced by Defendants and affected commerce and consumers throughout the fifty (50) states. NAMM, the largest music industry trade organization in the United States, facilitated, coordinated, conspired and colluded with Defendant Manufacturers and Guitar Center to control retail pricing of musical instruments and equipment purchased by class members through distribution in retail stores and online throughout the United States. By virtue of its power to control prices and exclude competition in the relevant markets, Guitar Center, in conspiracy with Defendant Manufacturers, possessed monopoly power in the musical instrument and equipment market.

## VIII. CLASS ACTION ALLEGATIONS

### A. Approximate Size of the Defined Class

39.     The approximate size of the Class is estimated to be in the millions. Members of the Class are dispersed throughout the United States. Members of the Class can be reasonably ascertained by objective information as each Class member pays an unlawful and artificially-inflated overcharge on their invoice, which is contained in Defendants' records. It would be economically burdensome to the Class and Defendants for each Class member to bring an individual lawsuit to vindicate his or her rights. Thus, members of the Class are so numerous that joinder is impractical.

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

## B. Common Questions of Law and Fact

40.   Questions of law and fact common to the members of the Class predominate over any questions affecting individual members.   Some of the common questions of fact and law include, but are not limited to:

(a) Whether Defendants engaged in a contract, combination, or conspiracy among themselves to fix, maintain or stabilize the prices of, or allocate the market for the sale of musical instruments and equipment in the United States;

(b) Whether Defendants engaged in a contract, combination, or conspiracy among themselves to fix, maintain or stabilize, or allocate the market for musical instruments and equipment in the United States;

(c) Whether the conduct of Defendants caused prices for musical instruments and equipment in the United States to be artificially inflated or maintained at non-competitive levels;

(d) The duration and extent of the combination or conspiracy alleged in this Complaint;

(e) Whether the conduct of Defendants was false, deceptive, unfair or unconscionable;

(f) Whether the conduct of Defendants unjustly enriched Defendants to the detriment of Plaintiffs and the Class; and

(g) Whether the Plaintiffs and the Class were injured by Defendants' conduct and, if so, the appropriate class-wide measure of damages and declaratory and injunctive relief.

### C. Predominance

41.   The aforementioned questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members, and as a preliminary or threshold matter may be decided before any individual issues.

Law Offices
TURNER & MANCL, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Class Action Complaint

### D. Typicality

42.   Plaintiffs' claims are typical of the claims of each of the members of the Class. Plaintiffs are businesses that purchased musical instruments and equipment during the relevant time period.  Plaintiffs' claims arise from the same course of conduct as the other members of the Class.

### E. Adequacy

43.   Plaintiffs will fairly and adequately protect the interests of the Class, have familiarity with the allegations herein, and are willing and able to assist counsel in decision making as to the conduct of the litigation.  The interest of Plaintiffs coincide with other members of the Class and there is no conflict of interest, nor do Plaintiffs know of any other difficulty to be encountered in litigation that would preclude maintenance of this lawsuit as a class action.  Further, Plaintiffs have retained counsel who are qualified and experienced in class actions and antitrust law and who are able to competently and aggressively prosecute this litigation for the benefit of all members of the Class.

### F. Superiority

44.   A class action lawsuit is appropriate and the superior method for the fair and efficient adjudication of this controversy.   Defendants overcharged consumers for musical instruments and equipment.  The proof will be uniform for members of the Class.  Certifying this lawsuit as a class action will avoid a multiplicity of suits with the consequent burden on the court system and will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense numerous individual actions would engender.   The benefits of proceeding through the class procedural mechanism available under the Federal Rules of Civil Procedure substantially outweighs any difficulties that may arise in management of this class action. Moreover, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants, would impair or impede the ability of other class members to protect their individual interests, and would substantially impair the rights of Class members who were harmed by

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Class Action Complaint

1  Defendants' unlawful conduct, but could not afford to bring their claims through separate,

2  individual litigation.

3       45.    Defendants have willfully and continuously maintained a conscious and uniform

4  pattern and practice of conduct generally applicable to members of the Class, making appropriate

5  final compensatory, declaratory and injunctive relief with respect to the Class as a whole.

6  **IX. COUNT 1 - VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**

7       46.    Plaintiffs reallege and incorporate by reference the allegations contained in

8  paragraphs 1-45 as if fully set forth herein.

9       47.    Defendants committed acts of unfair competition as defined by Section 17200, *et*

10 *seq.* of the California Business and Professions Code ("Unfair Competition Law"), by engaging in

11 the acts and practices specified herein.   Defendants' unlawful business acts and practices and

12 policies were adopted, orchestrated and carried out in California and implemented and enforced

13 throughout the rest of the United States.

14      48.    The contract, combination or conspiracy alleged herein has had and will continue to

15 have the following effects:

16          (a)    Competition in the musical instrument and equipment industry has been

17                 unlawfully restrained, suppressed or eliminated;

18          (b)    Plaintiffs and members of the Class have been denied the benefits of free

19                 open and unrestricted competition in the musical instrument and equipment

20                 industry; and

21          (c)    The price of musical instruments and equipment have been maintained or

22                 stabilized at artificially high and non-competitive levels.

23      49.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

24 other members of the Class have suffered injury to their business or property and have paid

25 artificially high and inflated prices for musical instruments and equipment.

26 \\\

27 \\\

28 \\\

Law Offices
TURNER & MASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

## X. COUNT 2 – VIOLATION OF STATE ANTITRUST AND UNFAIR COMPETITION LAWS

50.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-49 as if fully set forth herein.

51.     Defendants have entered in illegal pricing agreements affecting consumers in violation of Alabama Code §§ 8-10-1, *et seq.*, Arizona Revised Statute. §§ 44-1401, *et seq.*, California Bus. & Prof. Code §§ 16700 *et seq.* and Cal. Bus. & Prof. Code §§ 17200, *et seq.*, District of Columbia Code Ann. §§ 28-4503, *et seq.*, Iowa Code §§ 553.1, *et seq.*, Kansas Stat. Ann. §§ 50-101, *et seq.*, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*, Michigan Comp. Laws Ann. §§ 445.773, *et seq.*, Minnesota Stat. §§ 325D.52, *et seq.*, Mississippi Code Ann. § 75-21-1, *et seq.*, Nebraska Rev. Stat. §§ 59-801, *et seq.*, Nevada Rev. Stat. § 598 A, *et seq.*, New Mexico Stat. Ann. §§ 57-1-1, *et seq.*, North Carolina Gen. Stat. §§ 75-1, *et seq.*, North Dakota Cent. Code §§ 51-08.1-01, *et seq.*, Ohio Rev. Code Ann. § 1331.01, *et seq.*, Pennsylvania common law, South Dakota Codified Laws Ann. §§ 37-1-3.1, *et seq.*, Tennessee Code Ann. §§ 47-25-101, *et seq.*, Vermont Stat. Ann. 9 §§ 2453, *et seq.*, West Virginia §§ 47-18-1, *et seq.*, Wisconsin Stat. §§ 133.01, *et. seq.*

52.     As a result of Defendants' anticompetitive and illegal conduct regarding musical instrument and equipment pricing, Plaintiffs and other members of the Class were injured in their business and property and paid more for musical instruments than they would have paid in the absence of Defendants' unlawful conduct.  Plaintiffs seek only those damages permitted and authorized by statute and applicable state law and waive the right to treble and multiple damages under any state law that only permits class certification for actual damages, but not treble, penalties or exemplary damages.

## XI. COUNT 3 – VIOLATION OF STATE CONSUMER PROTECTION LAWS

53.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-52 as if fully set forth herein.

54.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state consumer protection and unfair competition statutes, including Alaska Stat. §§ 45.50.471, *et seq.*, Ark. Code Ann. § 4-88-101, *et seq.*, California

Law Offices
TURNER & MASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Law Offices
TURNER & MASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Bus. & Prof. Code § 17200 *et seq.*, District of Columbia Code § 28-3901, *et seq.*, Florida Stat. § 501.201 *et seq.*, Hawaii Rev. Stat. § 480 *et seq.*, Idaho Code § 48-601 *et seq.*, Kansas Stat. § 50-623 *et seq.*, Louisiana Rev. Stat. § 51:1401 *et seq.*, 5 Maine Rev. Stat. § 207, *et seq.*, Massachusetts G.L. c. 93A *et seq.*, Montana Code § 30-14-101, *et seq.*, Nebraska Rev. Stat. § 59-1601, *et seq.*, New Mexico Stat. § 57-12-1, *et seq.*, New York Gen. Bus. Law § 349 *et seq.*, North Carolina Gen. Stat. § 75-1.1, *et seq.*, Oregon Rev. Stat. § 646.605, *et seq.*, Rhode Island Gen. Laws § 6-13.1-1, *et seq.*, South Carolina Code Laws § 39-5-10, *et seq.*, Utah Code § 13-11-1, *et seq.*, 9 Vermont § 2451, *et seq.*, West Virginia Code § 46A-6-101, *et seq.*, Wyoming Stat. § 40-12-105.

55.     As a result of Defendants' anticompetitive and illegal conduct regarding musical instrument and equipment pricing, Plaintiffs and other member of the Class were injured in their person, business and property and paid more for musical instruments and equipment than they would have paid in the absence of Defendants' unlawful conduct.   Plaintiffs seek only those damages permitted and authorized by statute and the applicable state law and waive the right to treble and multiple damages under any state law, that only permit class certification for actual damages, but not treble, penalties or exemplary damages.

## XII. COUNT 4– RESTITUTION AND UNJUST ENRICHMENT

56.     Plaintiffs reallage and incorporate by reference the allegations contained in paragraphs 1-55 as if fully set forth herein.

57.     As a direct and proximate consequence of Defendants' wrongful conduct in charging artificially inflated prices for musical instruments, Plaintiffs and other members of the Class have suffered a detriment while Defendants have incurred a substantial benefit.   The excessive prices charged for musical instruments have resulted in Defendants holding monies, which, in equity and good conscience, belong to Plaintiffs and the Class.   Defendants are obligated to disgorge those profits and refund the money unlawfully obtained to Plaintiffs and the Class, which ought not in justice and equity be kept by Defendants and should be returned as restitution.

58.     As a result of Defendants' conduct, Plaintiffs and the Class suffered actual damages as more fully discussed herein, which should be returned as unjust enrichment.

## XIII. COUNT 5 – FEDERAL ANTITRUST LAW

59.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-58 as if fully set forth herein.

60.     Beginning at a time presently unknown to Plaintiffs, but at least as early as 2001 and continuing through 2007, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, set, maintain, and/or stabilize prices for musical instruments sold in the United States in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

61.     In formulating, developing and implementing the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators engaged in activities to further the conspiracy to raise, fix, set, maintain and stabilize prices for musical instruments and equipment, as alleged herein. The unlawful agreement, conspiracy and collusive activity alleged herein has resulted in the following:

a.     Price competition in the sale of musical instruments and equipment in the United States has been restrained, suppressed, and/or eliminated;

b.     Prices for musical instruments and equipment sold by Defendants and their co-conspirators have been raised, fixed, set, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c.     Those persons and entities who have purchased musical instruments and equipment directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

## IX. TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING

62.     The applicable statute of limitations for the causes of action brought by Plaintiffs has been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentation. Defendants acted affirmatively to conceal and suppress the truth of their illegal conduct and made conscious efforts to preclude Plaintiffs and members of the Class from discovering their illegal acts and conduct.

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212, FAX (619) 237-0325

63.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and other members of the Class were injured by Defendants and did not discover or could not have discovered through the exercise of reasonable diligence the existence of the claims brought herein until the Federal Trade Commission made public its investigation in the Spring of 2009.

## X – DEMAND FOR JURY TRIAL

64.     Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of all issues so triable.

**WHEREFORE**, Plaintiffs prays as follows:

(a)     For an order certifying this lawsuit as a class action, and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(b)     For compensatory and actual damages against Defendants jointly and severally;

(c)     For treble damages against Defendants, jointly and severally, as applicable under federal or state law, unless waived if treble damages cannot be pursued on a class-wide basis under the applicable state law;

(d)     For restitution and disgorgement of any inequitable gain, including profits;

(e)     For punitive damages for Defendants' intentional and malicious conduct;

(f)     For an injunction enjoining Defendants from the wrongful conduct alleged herein; and

(g)     For pre- and post-judgment interest, costs and a reasonable attorney's fee award against Defendants jointly and severally.

Dated: October 2, 2009                          TURNER & MAASCH, INC.

By: _____
        Mark A. Maasch
        Attorneys for Plaintiffs, Walter
        Witherspoon D/B/A   Racy Brothers
        Enterprizes, Lil Walt Production

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Class Action Complaint

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

**ORIGINAL**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**FILED**

## I. (a) PLAINTIFFS

Walter Witherspoon dba Racy Brothers Enterprizes, and Lil Walt Productions, on behalf of themselves and others similarly situated

**DEFENDANTS**

See Attached

**09 OCT -2   PM 3: 04**

**(b)** County of Residence of First Listed Plaintiff  Desha Co., AR
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  San Diego, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**DEPUTY**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Mark A. Maasch, Turner & Maasch, Inc., 550 West C Street, Ste. 1160, San Diego, CA  92101; 619-237-1212

Attorneys (If Known)

**'09 CV 2178 BTM   CAB**

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN  (Place an "X" in One Box Only)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 USC sec. 1

Brief description of cause:
Violation of Sherman Act sec. 1, and various state unfair trade practice and antitrust statutes

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE  Hon. Larry A. Burns   DOCKET NUMBER  3:09-CV-2002-LAB-JMA

DATE
10/02/2009

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  5864   AMOUNT  350.   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

10/2/09

LIST OF DEFENDANTS

NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC;    FENDER MUSICAL
INSTRUMENTS COMPANY; GIBSON MUSICAL INSTRUMENTS CORPORATION;
GUITAR CENTER, INC.; BAIN CAPITAL, LLC; C.F. MARTIN & CO., INC.; KORG, USA,
INC.; PEAVEY ELECTRONICS; ROLAND CORPORATION U.S.; YAMAHA
CORPORATION  OF AMERICA; TASCAM, TEAC CORPORATION OF NORTH
AMERICA, and TEAC,

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS005864
Cashier ID: sramirez
Transaction Date: 10/02/2009
Payer Name: CALEXPRESS
----------------------------------
CIVIL FILING FEE
 For: CALEXPRESS
 Case/Party: D-CAS-3-09-CV-002178-001
 Amount:        $350.00
----------------------------------
CHECK
 Check/Money Order Num: 50372
 Amt Tendered:  $350.00
----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```